**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMED JAWAD, )<br>(aka SAKI BACHA) )<br>c/o Eric S. Montalvo )<br>1150 Connecticut Ave, NW Suite 900 )<br>Washington, DC 20036 )<br>)<br>        Plaintiff, )<br>)<br>vs. )<br>)<br>CHUCK HAGEL )<br>Secretary of Defense )<br>Department of Defense )<br>1000 Defense Pentagon )<br>Washington, DC 20301-1000 )<br>)<br>ROBERT M. GATES )<br>Fmr. Secretary of Defense )<br>Department of Defense )<br>1000 Defense Pentagon )<br>Washington, DC 20301-1000 )<br>)<br>DONALD H. RUMSFELD )<br>Fmr. Secretary of Defense )<br>Department of Defense )<br>1000 Defense Pentagon )<br>Washington, DC 20301-1000 )<br>)<br>PAUL WOLFOWITZ )<br>Fmr. Deputy Secretary of Defense )<br>Department of Defense )<br>1000 Defense Pentagon )<br>Washington, DC 20301-1000 )<br>)<br>RAY MABUS )<br>Secretary of the Navy )<br>1000 Navy Pentagon )<br>Washington, DC 20350-1000 )<br>)<br>)<br>) | C.A. No: _____<br><br>COMPLAINT FOR DAMAGES |

1

GORDON R. ENGLAND                           )
Fmr. Secretary of the Navy                  )
1000 Navy Pentagon                          )
Washington, DC 20350-1000                   )
                                            )
JOHN M. McHUGH                              )
Secretary of the Army                       )
101 Army Pentagon                           )
Washington, DC 20310-0101                   )
                                            )
FRANK SWEIGART                              )
Director of the Office for the Administrative )
Review Of the Detention of Enemy            )
Combatants c/o United States Navy           )
1010 Defense Pentagon                       )
Washington, DC 20301-1010                   )
                                            )
JAMES M. MCGARRAH                           )
Fmr. Director of the Office for the         )
Administrative Review Of the Detention of   )
Enemy Combatants c/o United States Navy     )
1010 Defense Pentagon                       )
Washington, DC 20301-1010                   )
                                            )
RICHARD MYERS                               )
Fmr. Chairman, Joint Chiefs of Staff        )
9999 Joint Staff Pentagon                   )
Washington, DC 20318-9999                   )
                                            )
PETER PACE                                  )
Fmr. Chairman, Joint Chiefs of Staff        )
9999 Joint Staff Pentagon                   )
Washington, DC 20318-9999                   )
                                            )
JAMES T. HILL                               )
Fmr. Acting Commander-in-Chief, U.S.        )
Southern Command                            )
c/o United States Army                      )
Army Pentagon                               )
Washington, DC 20310-0200                   )
                                            )
                                            )
                                            )
                                            )
                                            )
                                            )

BANTZ J. CRADDOCK                         )
Fmr. Acting Commander-in-Chief, U.S.      )
Southern Command                          )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
JAMES G. STAVRIDIS                        )
Fmr. Acting Commander-in-Chief, U.S.      )
Southern Command                          )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
GEOFFREY D. MILLER                        )
Fmr. Commander, Joint Task Force-         )
Guantanamo                                )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
JAY HOOD                                  )
Fmr. Commander, Joint Task Force-         )
Guantanamo                                )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
HARRY B. HARRIS                           )
Fmr. Commander, Joint Task Force-         )
Guantanamo                                )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
MARK H. BUZBY                             )
Fmr. Commander, Joint Task Force-         )
Guantanamo                                )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )

DAVID THOMAS                              )
Fmr. Commander, Joint Task Force-         )
Guantanamo                                )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
BRUCE VARGO                               )
Fmr. Commander, Joint Detention           )
Operations Group                          )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
WADE DENNIS                               )
Fmr. Commander, Joint Detention           )
Operations Group                          )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
MICHAEL BUMGARNER                         )
Fmr. Commander, Joint Detention           )
Operations Group                          )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
NELSON CANNON                             )
Fmr. Commander, Joint Detention           )
Operations Group                          )
Guantanamo Bay Naval Base, Cuba           )
c/o United States Army                    )
Army Pentagon                             )
Washington, DC 20310-0200                 )
                                          )
PAUL RESTER                               )
Director, Joint Intelligence Group        )
Guantanamo Bay Naval Base, Cuba           )
c/o Department of Defense                 )
Defense Pentagon                          )
Washington, DC 20301-1000                 )

ESTEBAN RODRIGUEZ )
Fmr. Director, Joint Intelligence Group )
Guantanamo Bay Naval Base, Cuba )
c/o Department of Defense )
Defense Pentagon )
Washington, DC 20301-1000 )
)
DANIEL MCNEILL )
Fmr. Commander, Coalition Forces – )
Afghanistan )
c/o Department of Defense )
Defense Pentagon )
Washington, DC 20301-1000 )
)
)
)
           Defendants. )

Plaintiff Mohammed Jawad ("Plaintiff"), by and through his counsel, respectfully alleges the following:

## **PRELIMINARY STATEMENT**

1. Plaintiff Mohammed Jawad is an Afghan citizen who was arrested and turned over to U.S. custody on December 17, 2002 following a grenade attack on two U.S. Special Forces soldiers. He was falsely arrested, falsely imprisoned and endured abusive, degrading, and inhuman treatment over the next six years.

2. Plaintiff suffered torture at the hands of U.S. Forces acting under the color of law in violation of the Alien Tort Claims Act, 28 U.S.C. § 1350. He endured starvation, sleep deprivation, blindfolding and hooding, beatings, physical and linguistic isolation, shackling, and threats to his life at the hands of investigative and law enforcement officers in further violation of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. The torture endured by Plaintiff is a blatant violation of customary international human rights laws and fundamental human rights.

3. This case seeks justice and redress for Plaintiff. Accordingly, this Court should order compensatory, punitive, exemplary, or other relief as necessitated by the facts and that this Court deems just and proper.

5

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. § 2671 (Federal Tort Claims Act), and 28 U.S.C. § 1350 (Alien Tort Statute), and the United States Constitution.

5. The Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680 (1948) is the statute by which the United States authorizes tort suits to be brought against itself. In 1948, by enacting the FTCA, Congress waived sovereign immunity for some tort suits and vested jurisdiction in the U.S. District Courts to hear all civil actions against the United States.

6. The Alien Tort Claims Act (hereinafter "ATCA") 28 U.S.C. § 1350 (1789), provides that the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

7. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(a)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391(e)(2), in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

8. Plaintiff has exhausted his remedies.  Plaintiff filed an appropriate claim for damage, injury, or death separately with the Departments of the Army and the Navy.  The U.S. Navy claim was dated received on 15 Dec 2010.  In correspondence dated 12 November 2013 from Department of the Navy, a denial of said claim was received.  This suit is filed pursuant to that denial.

## PARTIES

9. Plaintiff Mohammed Jawad was born and raised by his mother and step-father in an Afghan refugee camp in Miran Shah, Pakistan. His exact age is unknown, although he is said to have been born just months before the death of his biological father in or around 1987 during the Afghan-Soviet War. Plaintiff was apprehended by Afghan authorities following the December 17, 2002 attack on two American Special Forces soldiers along with their Afghan interpreter in a Kabul bazaar. Plaintiff was interrogated by Afghan authorities, turned over to U.S. custody, and transported to a U.S. Prison in Bagram, Afghanistan, where interrogators extracted two conflicting confessions in Dari, a language that Plaintiff did not speak. Plaintiff was transported to Guantanamo Bay on or

about February 6, 2003 where he was charged with Attempted Murder in Violation of the Law of War and Intentionally Causing Serious Bodily Injury. For the next six years, he was detained under the exclusive control of Defendant and subjected to cruel and inhuman treatment. His Internment Serial Number is 900. His petition for writ of habeas corpus was granted on July 30, 2009 by District Court Judge Ellen Segal Huvelle. Plaintiff departed Guantanamo for Afghanistan on August 24, 2009, where he currently resides.

10. Defendant Chuck Hagel is a United States citizen. Defendant Hagel is the current United States Secretary of Defense.

11. Defendant Chuck Hagel is a United States citizen. Defendant Hagel is the current United States Secretary of Defense.

12. Defendant John McHugh is a United States citizen. Defendant McHugh is the current United States Secretary of the Army.

13. Defendant Ray Mabus is a United States citizen. Defendant Mabus is the current United States Secretary of the Navy.

14. Defendant Robert M. Gates is a United States citizen. Defendant Gates was the United States Secretary of Defense from 2006 until 2011, including the period of time in which the events herein described began. At all relevant times, Defendant Gates possessed and exercised command and control over the United States military and the United States detention facility at Guantanamo. Defendant Gates is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

15. Defendant Donald H. Rumsfeld is a United States citizen. Defendant Rumsfeld was the United States Secretary of Defense from 2001 until 2006, including the period of time in which the events herein described began. At all relevant times, Defendant Gates possessed and exercised command and control over the United States military and the United States detention facility at Guantanamo. Defendant Gates is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting

subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

16. Defendant Paul Wolfowitz is a United States citizen and former Deputy Secretary of Defense from 2011 until 2005, including the period of time in which the events herein described occurred. Defendant Wolfowitz is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

17. Defendant Gordon R. England is a United States citizen. Defendant England served simultaneously as both the Secretary of the Navy and the Designated Civilian Official of detainees from 2003 until 2005. Following the 2004 Supreme Court ruling in *Boumediene v. Bush* granting Guantanamo Bay prisoners the right to plead their cases in U.S. Courts, Mr. England was appointed to head a panel of military officers who were to determine whether certain Guantanamo detainees would be released based on recommendations of the Combatant Status Review Tribunal (hereinafter "CSRT") or Administrative Review Boards (hereinafter "ARB"). *Boumediene v. Bush*, 553 U.S. 723 (2008). Mr. England also served as Deputy Secretary of Defense from 2005 until 2009, including the period of time in which the events herein described occurred. Defendant England is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

18. Defendant Frank Sweigart is a United States citizen and the Deputy Director of the Office for the Administrative Review of Detained Enemy Combatants (hereinafter "OARDEC") since 2006, including the period of time in which the events herein described occurred. Defendant Sweigart is responsible for overseeing the operation of the annual ARB hearings for detainees being held in extrajudicial detention on Guantanamo, as well as CSRT. Defendant Sweigart is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

19. Defendant Rear Adm. James M. McGarrah is a United States citizen and was the Director of OARDEC and CSRT from 2004-2006, including the period of time in which the events herein described occurred. In this capacity he approved the CSRT recommendation that Plaintiff be designated an enemy combatant on November 4, 2004, a decision that was reaffirmed in two ARB conducted by OARDEC. Defendant McGarrah is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

20. Defendant Richard Myers is a United States citizen who served as the Chairman of the Joint Chiefs of Staff from 2001 until 2005, including the period of time in which the events herein described occurred. Defendant Myers possessed and exercised control over the United States military as well as over Guantanamo Bay Naval Base. Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

21. Defendant Peter Pace is a United States citizen and was Chairman of the Joint Chiefs of Staff from 2005 until 2007, including the period of time in which the events herein described occurred. Defendant Pace possessed and exercised control over the United States military as well as over Guantanamo Bay Naval Base. Defendant Pace is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

22. Defendant James T. Hill is a United States citizen. Defendant Hill was the Commander of the United States Southern Command from 2002 until 2004, including the period of time in which the events herein described occurred. As senior commander, Defendant Hill possessed authority, control, and command over the detainees at Guantanamo. Defendant Hill is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with,

aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

23. Defendant Bantz J. Craddock is a United States citizen. Defendant Craddock was the Commander of the United States Southern Command from 2004 until 2006, including the period of time in which the events herein described occurred. As senior commander, Defendant Craddock possessed authority, control, and command over the detainees at Guantanamo. Defendant Craddock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

24. Defendant James G. Stavridis is a United States citizen. Defendant Stavridis was the Commander of the United States Southern Command from 2006 until 2009, including the period of time in which the events herein described occurred. As senior commander, Defendant Stavridis possessed authority, control, and command over the detainees at Guantanamo. Defendant Stavridis is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

25. Defendant Geoffrey D. Miller is a United States citizen and was the Commander of Joint Task Force – Guantanamo from 2002 until 2004. Defendant Miller was responsible for all operations and interrogations conducted at Guantanamo during the period of time in which the events herein described occurred. During his tenure as commander, Defendant Miller supervised the implementation of the interrogation techniques as directed by Defendant Rumsfeld. He possessed authority, control, and command over the detainees at Guantanamo. Defendant Miller is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

26. Defendant Jay Hood is a United States citizen. Defendant Hood was the Commander of Joint Task Force – Guantanamo from 2004 until 2006. Defendant Hood was responsible for all operations and interrogations conducted at Guantanamo during the period of time

in which the events herein described occurred. During his tenure as commander, Defendant Hood was noted for implementing the practice of force feeding detainees with the use of a restraining chair. He possessed authority, control, and command over the detainees at Guantanamo. Defendant Hood is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

27. Defendant Harry B. Harris is a United States citizen and was the Commander of Joint Task Force – Guantanamo from 2006 until 2007. Defendant Harris was responsible for all operations and interrogations conducted at Guantanamo during the period of time in which the events herein described occurred. Defendant Harris is noted for being in charge when three prisoners died during interrogations in 2006. The deaths were reported as suicides, however, inconsistencies in the official accounts of the deaths suggested that they were the direct result of interrogation techniques, including torture. Defendant Harris is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

28. Defendant Mark H. Buzby is a United States citizen and was the Commander of Joint Task Force – Guantanamo from 2007 until 2008. Defendant Buzby was responsible for all operations and interrogations conducted at Guantanamo during the period of time in which the events herein described occurred. Defendant Buzby is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

29. Defendant David Thomas is a United States citizen and was the Commander of Joint Task Force – Guantanamo from 2008 until 2009. Defendant Thomas was responsible for all operations and interrogations conducted at Guantanamo during the period of time in which the events herein described occurred. Defendant Thomas is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for,

exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

30. Defendant Bruce Vargo is a United States citizen and was the Commander of the Joint Detention Operations Group at Guantanamo from 2007 until 2010, including the period of time in which the events herein described occurred. As commander, he was responsible for the security of the facility. Defendant Vargo possessed and exercised command and control over the detainees. Defendant Vargo is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

31. Defendant Wade Dennis is a United States citizen and was the Commander of the Joint Detention Operations Group at Guantanamo from 2006 until 2007, including the period of time in which the events herein described occurred. As commander, he was responsible for the security of the facility. Defendant Dennis possessed and exercised command and control over the detainees. Defendant Dennis is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

32. Defendant Michael Bumgarner is a United States citizen and was the Commander of the Joint Detention Operations Group at Guantanamo from 2005 until 2006, including the period of time in which the events herein described occurred. As commander, he was responsible for the security of the facility. Defendant Bumgarner possessed and exercised command and control over the detainees. Defendant Bumgarner is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

33. Defendant Nelson Cannon is a United States citizen and was the Commander of the Joint Detention Operations Group at Guantanamo from 2003 until 2004, including the period of time in which the events herein described occurred. As commander, he was responsible for the security of the facility. Defendant Cannon possessed and exercised command and control over the detainees. Defendant Cannon is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

34. Defendant Paul Rester is a United States citizen. Defendant Rester is the Director of the Joint Intelligence Group at Guantanamo Bay detention camp. As the chief interrogator, Defendant Rester has been responsible for overseeing the intelligence-gathering operations since 2005, including the period of time in which the events herein described occurred. Defendant Rester possessed and exercised command and control over the detainees. Defendant Rester is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

35. Defendant Esteban Rodriguez is a United States citizen. Defendant Rodriguez was the Director of the Joint Intelligence Group at Guantanamo Bay detention camp from 2003 to 2005. As the chief interrogator, Defendant Rodriguez was responsible for overseeing the intelligence-gathering operations, including the period of time in which the events herein described occurred. Defendant Rodriguez possessed and exercised command and control over the detainees. Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

36. Defendant Daniel McNeill is a United States citizen. Defendant McNeill was Commander of the Coalition Forces in Afghanistan until 2003. He oversaw all intelligence activity and treatment of prisoners in Afghanistan during the time in which the events herein described occurred. Defendant McNeill possessed and exercised

command and control over subordinates in Afghanistan. Defendant McNeill is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or otherwise directly or indirectly participating in the abuses of Plaintiff as hereinafter alleged.

37. Plaintiff brings this action for compensatory and punitive damages against Defendants Hagel, Gates, Rumsfeld, Wolfowitz, England, Sweigart, McGarrah, Myers, Pace, Hill, Craddock, Stavridis, Miller, Hood, Harris, Buzby, Thomas, Vargo, Dennis, Bumgarner, Cannon, Rester, Rodriguez, and McNeill for their roles in the harms committed against him in violation of domestic and international law. Defendants exercised command responsibility and control over Plaintiff, directly and indirectly participated in the commission of abusive and illegal practices alleged herein amounting to torture including the "frequent flyer" sleep deprivation program, prolonged solitary confinement and linguistic isolation, excessive cold, loud noise, and a gross violation of his due process rights at the U.S. prison at Bagram and Guantanamo Bay.

## STATEMENT OF FACTS

### A.  General Background

38. Following his arrest on December 17, 2002 in connection with a hand grenade attack on an American military vehicle that injured two U.S. Special Forces soldiers and their Afghan interpreter, Plaintiff was held and interrogated by Afghan officials. He was transferred to U.S. custody that evening at Forward Operating Base 195 at the Kabul Military Training Center and then detained in the exclusive custody, care and control of Defendants at a U.S. Prison in Bagram, Afghanistan from December 18, 2002 until February 6, 2003. He was then transferred to Guantanamo Bay and detained there from February 3, 2003 until the date of his release on July 30, 2009.

### B.  Forward Operating Base 195 and the U.S. Prison in Bagram, Afghanistan

39. Forward Operating Base 195 (hereinafter "FOB") is located about eight miles from downtown Kabul within the Kabul Military Training Compound (hereinafter "KMTC").

The facility is used for U.S. Army conducted basic training for Afghan National Army soldiers.

40. The Bagram Theater Internment Facility is a U.S.-run prison located next to Bagram Airfield in the Parwan Province of Afghanistan. Although originally meant to be a temporary location for detainees, it has now accumulated more detainees than the Guantanamo Bay detention camp. In 2005, The New York Times obtained a 2,000-page confirmation U.S. Army report concerning the homicides of two unarmed civilian Afghan prisoners by U.S. armed forces in 2002 at the Bagram facility. The file contained sworn statements to Army investigators written by soldiers describing cruel and humiliating interrogation techniques routinely used on detainees to extract information. An autopsy report of one of the deceased revealed heart failure resulting from blunt force injuries to the lower extremities. US laws do not apply at Bagram where the CIA oversees and takes part in interrogations. Detainees are deprived of access to lawyers, journalists, and the Red Cross.

## C.  Guantanamo Bay Detention Camp

41. Guantanamo Bay is a "United States territory" over which the United States exercises "unchallenged and indefinite control" as described by Justice Kennedy in *Rasul v. Bush*, 542 U.S. 466 (2004). Located on the southeastern tip of Cuba, it is the only U.S. base located in a communist country. Originally leased to the U.S. in 1903 and used as a coaling station for U.S. Navy ships, the U.S. began housing those suspected of terrorist activity or of having ties to al-Qaeda and the Taliban in early 2002.

42. According to legal memoranda from 2002, officials at the White House and the Department of Defense believed that because the foreign citizens detained at Guantanamo stood beyond the reach of U.S. law, including U.S. international obligations under the Geneva Conventions and other international humanitarian and human rights laws, that prisoners had no remedies and thus they could "legally" push the boundaries of interrogation methods at the facility. As such, detainees were subjected to harsh, abusive, and unethical treatment such as solitary confinement for periods exceeding a year, sleep deprivation, excessive exposure to extreme heat, beaten, deprived of medical treatment, shackled, and subject to death threats upon them and their loved ones. *Report on Torture*

*and Cruel, Inhuman, and Degrading Treatment of Prisoners at Guantanamo Bay, Cuba*, (CCR, New York, N.Y.), Jul. 2006 at 15-25.

43. On June 28, 2004 the U.S. Supreme Court held in *Rasul* that U.S. courts have jurisdiction to hear habeas corpus petitions filed on behalf of foreign nationals imprisoned at Guantanamo Bay because although Cuba has ultimate sovereignty over the base, "the United States has always exercised 'complete jurisdiction and control.'" *Rasul*, 542 U.S. at 21. As a result of this ruling, hundreds of petitions for the writ of habeas corpus flowed in, however, the government's refusal to provide counsel and access to detainees' information in a timely manner resulted in habeas proceedings that often were prolonged for years after filing.

44. In 2006, President George Bush's Military Commissions Act limited detainees' habeas freedoms by establishing procedures to try alien unlawful enemy combatants engaged in hostilities against the United States through the use of military commissions. *Military Commissions Act*, 10 U.S.C. § 948a (2006). In addition, under the Act no alien unlawful enemy combatant subject to trial by military commission may invoke the Geneva Conventions as a source of rights. 10 U.S.C. § 948b(g). With the passing of the Act came the creation of the Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) in 2004 to establish military tribunals to determine the status of detainees. OARDEC employs Combatant Status Review Tribunals (hereinafter "CSRT") and annual Administrative Review Boards (hereinafter "ARB") to make recommendations as to whether detainees will continue being held captive or be released.

45. Despite the establishment of CSRT, ARB, and allowing the prisoners' cases to be heard in U.S. courts, reports of psychological, physical, medical abuse, sexual provocation, rape, harassment, religious and cultural abuse, and other inhumane methods of extracting information from detainees continued to surface.

D. Throughout its existence, many of the 775 detainees at Guantanamo have been found to be noncombatants with no ties to the Taliban, al-Qaeda, or any other terrorist group. Currently, about 154 prisoners remain at the facility, the majority having already been cleared or are expected to be cleared of charges due to lack of evidence against them. Alyssa Fetini, *A Brief History of Gitmo*, Time, Nov. 12, 2008, http://content.time.com/time/nation/article/0,8599,1858364,00.html.

**The Plaintiff**

46. Mohammed Jawad (hereinafter "Jawad") was born in an Afghan refugee camp in Miran Shah, Pakistan on or about 1987. His biological father was killed shortly after his birth during the Afghan-Soviet War and he was raised by his mother and step-father in the refugee camp. He lived with his mother, step-father, two half-brothers and two half-sisters.

47. At the refugee camp, Jawad went to school for about six years. He received his education in Pashto, one of two official languages of Afghanistan. He does not speak any other language and is illiterate.

48. Jawad began working at the age of 15 to help support himself and his family. In December 2002 he traveled to Afghanistan on the promise of a dangerous yet high-paying job removing landmines.

**E.  Plaintiff's Arrest Following the December 17, 2002 Attack**

49. On the afternoon of December 17, 2002, a hand grenade was launched into an American military vehicle occupied by two U.S. Special Forces soldiers and their Afghan interpreter as they were stopped in traffic in a Kabul bazaar. The explosion left the soldiers badly injured but alive.

50. Jawad was arrested and interrogated by Afghan authorities. He was subject to cruel and abusive treatment including death threats against him and his family, beatings, and deprivation of food or drink during the approximate 6.5 hours in their custody. Jawad appeared to be under the influence of drugs but was nevertheless interrogated for several hours. He signed a written confession that was written in Farsi and contained several incorrect factual assertions including his family members' names and his age and residence. The confession also attributed full responsibility of the attack to Jawad. Jawad is illiterate and furthermore does not speak Farsi. It was this confession upon which Defendants relied on as a basis for Jawad's detention as well as the charges brought against him at Guantanamo.

**F.  Plaintiff Turned Over to U.S. Custody at Forward Operating Base 195 and later at Bagram**

51. On the evening of his arrest following his interrogation by Afghan officials, Jawad was transferred to U.S. custody and taken to Forward Operating Base 195 (hereinafter "FOB") for further interrogation.

52. Although it was concluded that Jawad was a juvenile and suffering from drug withdrawal, he was nevertheless deprived of food, drink, and sleep. No attempt was made at contacting his parents nor was he permitted to contact any other guardian, friend, or family member. He was not informed of his right to counsel or to remain silent.

53. Jawad was ordered to remove all of his clothing, strip-searched, and photographed nude in front of several on-lookers. He was blindfolded and hooded, told that if he did not cooperate he would never see his family again, and made to hold a water bottle which he was told was a bomb that could explode at any moment.

54. At the conclusion of his interrogation at FOB, Jawad allegedly confessed to the attack. This confession was allegedly videotaped, however, this videotape has never been found. The second confession provided a completely different version of the grenade attack, however the two conflicting statements eventually formed the basis for Jawad's transfer to Guantanamo.

55. On December 18, 2002, Jawad was transported to the U.S. Prison at Bagram, Afghanistan for further interrogation, where he remained for the next 49 days.

56. During that time, Jawad was subjected to severe abuse, maltreatment, and torture in the form of beatings, hooding, physical and linguistic isolation, sleep deprivation, death threats, forced stress positions, being chained to the wall for prolonged periods, pushed down the stairs, and various other forms of intimidation.

57. Throughout the 11 interrogations he endured, Jawad maintained that he did not throw the hand grenade that injured the two U.S. soldiers and their interpreter on December 17, 2002.

58. On or about February 6, after having been intentionally starved for three days and given only sips of water, Jawad was transported to Guantanamo Bay Naval Base, Cuba.

### G.  The Inhumane Treatment and Torture of Plaintiff at Guantanamo

59. Following his arrival at Guantanamo, Jawad spent the majority of 2003 in social, physical and linguistic isolation, with his only human contact being his interrogators. Unlike the other juvenile detainees, he was housed with the adult population rather than in separate facilities and did not receive any rehabilitation treatment or special education.

60. On December 25, 2003, Jawad attempted suicide.

61. Throughout his six years at Guantanamo, Jawad was frequently subjected to various forms of cruel treatment such as excessive cold, loud noise, beatings, pepper-spray, remaining in shackles for prolonged periods,

### a.  Frequent Flyer Sleep Deprivation Program

62. Sleep deprivation was a common interrogation technique used at Guantanamo with the purpose of disorienting detainees in order to extract information.

63. The "frequent flyer" program was utilized by Joint Task Force – Guantanamo beginning in or about November 2003. This method consisted of repeatedly moving detainees from one cell to another in quick intervals throughout the night to disrupt sleep cycles. In order to use this technique, approval by the Joint Task Force Commander was required, and it was not to be used in excess of four days.

64. Although its use was ordered discontinued in March of 2004, the technique was nonetheless utilized on Jawad into May of 2004. According to military records, use of the frequent flyer program on Jawad was unauthorized and done without the approval of the Joint Task Force Commander.

65. According to military records, Jawad was subjected to the frequent flyer program over a 14-day period, during which he was moved from cell to cell 112 times, an average of every 2 hours and 50 minutes. Defense Motion to Dismiss Based on Torture of Detainee Pursuant to R.M.C. 907, *United States of America v. Mohammed Jawad*, No. AE083 (2008).

66. Physical effects of the acute sleep deprivation included blood in Jawad's urine, body aches and weight loss.

**H.  Combatant Status Review Tribunal and Administrative Review Boards**

    **a.  Enemy Combatant Status**

67. An "enemy combatant" according to the Council on Foreign Relations is an individual who under the laws and customs of war, may be detained for the duration of an armed conflict. Following the attacks of September 11, the Bush administration designated any alleged member of al Qaeda or the Taliban as an enemy combatant and declared that they were to be held in detention by the U.S. government as part of the war on terror. The President has absolute authority to detain enemy combatants.

68. A lawful enemy combatant is, in summary, a person who has engaged in hostilities against the United States. Similarly, an unlawful enemy combatant is a person who has engaged in hostilities against the United States, and in addition have purposefully and materially supported hostilities against the United States alongside a member of the Taliban or al-Qaeda. Lawful combatants receive prisoner of war status and the protections of the Third Geneva Convention, while unlawful enemy combatants do not.

    **b.  Combatant Status Review Tribunals**

69. Combatant Status Review Tribunals (hereinafter "CSRT") were established pursuant to the Supreme Court ruling in *Rasul*  whereby it was held that Guantanamo detainees had access to U.S. courts to challenge their detention. *Rasul*, 542 U.S. at 28.

70. According to Department of Defense manuals, CSRT is a non-adversarial one-time administrative process designed to determine whether each Guantanamo detainee meets the criteria to be designated as an enemy combatant. Detainees are given an opportunity to exercise their due process rights and contest their designation as enemy combatants. Detainees are given the right to a personal representative to assist with their case, to receive unclassified evidence and information, and the opportunity for a second CSRT to reconsider the initial determination of enemy combatant status. *Memorandum for Secretaries of the Military Departments Chairman of the Joint Chiefs of Staff Under Secretary of Defense for Policy*, (Dept. of Defense, Washington, D.C.), Jul. 2006, at 4-6.

71. CSRT is riddled with procedural flaws. In each tribunal, the detainee carries the burden of contesting his enemy combatant designation, however, the detainee is denied counsel, access to classified evidence, ability to call witnesses, and adequate time and resources to prepare a defense of the allegations. Going into the CSRT there is already a presumption

that the government's evidence is "genuine and accurate" and the tribunals are not bound by the rules of evidence but instead are instructed to consider any evidence they deem "relevant and helpful" in making their determination.

### c.   Administrative Review Boards

72. According to Department of Defense manuals, an Administrative Review Board (hereinafter "ARB") is designed to determine whether a detainee continues to pose a threat to the United States or its allies once it is determined that they are an enemy combatant. If the ARB determines that a detainee no longer poses a threat, they may be released from detention.

73. At the ARB detainees are given the opportunity to present a written or oral statement as well as submit written statements from family members or other persons who can explain why they are no longer a threat. Like the CSRT, witnesses are not allowed to testify and there is no right to counsel. Instead, an Assisting Military Officer is designated to assist detainees in preparing their case.

### d.   Plaintiff's Combatant Status Review Tribunal and Administrative Review Boards

74. On November 4, 2004, Jawad was determined to be an enemy combatant by CSRT. In preparation for his CSRT Jawad met with his personal representative for two hours. No documents were submitted on his behalf and no witnesses were called. On November 4, 2004, Jawad was determined to be an enemy combatant after his personal representative declined the opportunity to offer comments or objections to the report concluding that Jawad was, in fact, an enemy combatant. He was not given the opportunity to talk to a lawyer for another three years.

75. Jawad's enemy combatant status was reaffirmed in ARBs conducted on December 8, 2005 and November 8, 2006.

76. Both the CSRT and ARB relied heavily on the alleged confessions given by Jawad while in the custody of Afghan authorities on December 17, 2002 and later while in U.S. Custody at the FOB. On both occasions, the confessions were obtained through the use of cruel and abusive interrogation practices while Jawad appeared to be under the influence of drugs or suffering from withdrawal. The first confession was a statement written in Farsi containing numerous incorrect facts, while the second confession was allegedly

videotaped although the tape was never found. Jawad was illiterate and only spoke Pashto, yet he signed and thumb printed a confession written in Farsi.

77. In November of 2008 the Military Commission through a military judge, Colonel Stephen R. Henley, determined that the Government could not use any statements made by Jawad on or about 2002 to secure a conviction because the confessions had been acquired through the use of death threats. <u>D-021 Ruling on Defense Motion to Suppress Out-of-Court Statements Made By The Accused Made While In U.S. Custody</u>, *United States of America v. Mohammed Jawad*, No. AE113 (2008).

## I. Charges Sworn Against Plaintiff

78. On October 9, 2007, more than four years after his arrival at Guantanamo, Jawad was charged under the Military Commissions Act of 2006 with attempted murder in violation of the law of war and of intentionally causing serious bodily harm. Neither charge involved an act of terrorism or affiliation with any terrorist group. The charges were referred to trial by military commission on January 30, 2009, one of only two juveniles having faced trial by military commission under the Military Commissions Act.

## J. Judicial Determination of "Abusive Conduct and Cruel and Inhuman Treatment"

79. On September 24th 2008 the Military Commission through a military judge, Colonel Stephen R. Henley, made the following findings of fact and conclusion of law[1]:

> 2. On or about December 17, 2002, in Kabul, Afghanistan, the Accused allegedly threw a hand grenade into a vehicle in which two American service members and their Afghan interpreter were riding. All suffered serious injuries. The Accused was immediately apprehended by Afghan police and transferred to U.S. custody the next day. He remained in continuous U.S. custody until his transfer to Guantanamo Bay, Cuba on or about February 6, 2003.[2]

> 3. On December 25, 2003, the accused attempted suicide.

---

[1] *United States v. Jawad*, D-008 Ruling

[2] The President directed in Military Order 1, dated November 13, 2001, that detainees would be treated humanely. A February 7, 2002 White House memo reaffirmed this order and stated further they would be treated, "to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva."

4. As early as November 2003, Joint Task Force-Guantanamo Bay personnel (JTF-GTMO) used a sleep deprivation measure to disorient selected detainees thought to have important intelligence data, disrupt their sleep cycles and biorhythms, make them more compliant and break down their resistance to interrogation. Pursuant to this technique, euphemistically referred to as the "frequent flyer" program, a detainee would be repeatedly moved from one detention cell to another in quick intervals, usually at night.

5. Shortly after assuming command of JTF-GTMO in March 2004, Major General (MG) Jay Hood ordered the "frequent flyer" program discontinued. Apparently unknown to MG Hood, the accused was subjected to the frequent flyer program and moved from cell to cell 112 times from 7 May 2004 to 20 May 2004, on average of about once every three hours. The accused was shackled and unshackled as he was moved from cell to cell. The Accused was not interrogated and the scheme was calculated to profoundly disrupt the his mental senses.

6. While the "frequent flyer" program was intended to create a feeling of hopelessness and despair in the detainee and set the stage for successful interrogations, by March 2004 the accused was of no intelligence value to any government agency. The infliction of the "frequent flyer" technique upon the Accused thus had no legitimate interrogation purpose.

7. On or about June 2, 2008, the Accused was beaten, kicked, and pepper sprayed for not complying with a guard's instructions. He suffered, among other injuries, a broken nose.

8. The conditions experienced by the Accused while confined at Guantanamo Bay include excessive heat, constant lighting, loud noise, linguistic isolation (separating the accused from other Pashto2 speakers), and, on at least two separate occasions, 30 days physical isolation.

10. The Military Commissions Act prohibits both the torture[3] and cruel and inhuman treatment of detainees. Any degrading

---

[3] 4 "Torture" under 18 U.S.C. § 2441(d)(1)(A) means "an act specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control for the purpose of obtaining information or a confession, or punishment, intimidation, coercion, or any reason based on discrimination of any kind." "'[S]evere mental pain or suffering'" means the

treatment[4] carries a presumption it was imposed as a punitive not preventative measure.

12. This Commission finds that, under the circumstances, subjecting this Accused to the "frequent flyer" program from May 7-20, 2004 **constitutes abusive conduct and cruel and inhuman treatment**. Further, it came at least two months after the JTF-GTMO commander had ordered the program stopped. Its continuation was not simple negligence but flagrant misbehavior. Those responsible should face appropriate disciplinary action, if warranted under the circumstances. (Emphasis Added)

*United States v. Jawad*, D-008 Ruling.

---

prolonged mental harm caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering; the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality; the threat of imminent death; or the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality." *See* 18 U.S.C. § 2340(2) (internal marks omitted).

Article I of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment defines torture as:

"any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. "

*See* United Nations General Assembly Resolution 39/46 of 10 December 1984.

[4] "Cruel or inhuman treatment" under 18 U.S.C. § 2441(d)(1)(B) means "an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incident to lawful sanctions), including serious physical abuse upon another within his custody or control."

**K. Granting of Habeas Corpus**

80. Jawad subsequently filed a habeas corpus petition on January 13, 2009 which was

granted by the Honorable Judge Ellen Segal Huvelle on July 30, 2009.  See Civil Action

No. 05-2385 (ESH) (ISN 900).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Plaintiff, a Minor Under the Age of 18 Who Was Not Properly Detained Was Tortured by U.S. Forces and Personnel on U.S. Soil in Violation of 28 U.S.C. § 1350**

81. The Alien Tort Claims Act (hereinafter "ATCA"), 28 U.S.C. § 1350, provides that "the

district courts shall have original jurisdiction of any civil action by an alien for a tort

only, committed in violation of the law of nations or a treaty of the United States." Under

the Act, an individual acting "under actual or apparent authority, or color of law, or any

foreign nation" who subjects an individual to torture is liable for damages to that

individual in a civil action. As such, foreign citizens are permitted under the ATCA to

seek remedies in the U.S. courts for human rights violations committed outside of the

United States.

82. For the purposes of the ATCA:

"(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
(A) the intentional infliction or threatened infliction of severe physical pain or suffering;
(B) the administration or application, or threatened administration or application, of mind altering substances

or other procedures calculated to disrupt profoundly the
senses or the personality;
(C) the threat of imminent death; or
(D) the threat that another individual will imminently be
subjected to death, severe physical pain or suffering, or the
administration or application of mind altering substances or
other procedures calculated to disrupt profoundly the
senses or personality.''

83. Courts have held that deliberate torture perpetrated under the color of official authority
violates universally accepted norms of the international law of human rights, regardless
of the nationality of parties, and when the alleged torturer is found and served with
process by an alien within U.S. borders, federal jurisdiction is provided under § 1350.
*Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir. 1980).

84. In *Filartiga*, seventeen-year-old Joelito Filartiga was kidnapped and tortured to death by
Americo Norberto Pena, the Inspector General of Police in Asuncion, Paraguay and a
Paraguayan citizen living in Paraguay. Following Filartiga's death, Pena fled to New
York and a civil complaint for wrongful death and torture was lodged against him in U.S.
Courts by the teen's sister. After an initial district court dismissal citing lack of
jurisdiction, the U.S. Court of Appeals for the Second Circuit ruled that customary
international laws had been violated and thus, the U.S. Courts had subject matter
jurisdiction under the ATCA. The court reasoned that in the twentieth century the
international community has come to recognize the common danger posed by the flagrant
disregard of basic human rights and particularly the right to be free of torture. *Filartiga*,
630 F.2d at 3.

85. During their numerous interrogations at Forward Operating Base 195 (hereinafter
"FOB"), Bagram, and Guantanamo Bay (U.S. Sovereign Soil), Defendants subjected
Jawad to cruel, degrading, and inhumane treatment amounting to torture including but not
limited to starvation, sleep deprivation, blindfolding and hooding, beatings, physical and
linguistic isolation, shackling, and threats to his life. Defendants sought to extract
intelligence from Jawad regarding the December 17, 2002 attack on Special U.S. Soldiers
in Kabul, Afghanistan.

86. By March 2004 Jawad was found to be of no intelligence value to any government
agency, however, Defendants nonetheless subjected him to the "frequent flyer" sleep

deprivation program (on U.S. Sovereign Soil), wherein sleep deprivation was used to disrupt the sleep cycles of detainees in order to make them compliant and break down their resistance to interrogation. From May 7, 2004 until May 20, 2004, Defendants moved Jawad on an average of once every three hours, totaling 112 times. Physical effects of the frequent flyer program included blood in Jawad's urine, body aches and weight loss.

87. On September 24, 2008, military judge Col. Stephen R. Henley stated in his *United States of America v. Mohammed Jawad* ruling on the D-008 Defense's Motion to Dismiss for Torture of the Detainee that the infliction of the frequent flyer program upon Jawad "had no legitimate interrogation purpose," that the program constituted "abusive conduct and cruel and inhuman treatment" and that "those responsible should face appropriate disciplinary action, if warranted under the circumstances." In defining "cruel and inhuman treatment" Judge Henley relied on 18 U.S.C. § 2441(d)(1)(B) which defines "cruel and inhuman treatment" as

> "The act of a person who commits, or conspires or attempts to commit, an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control."

88. Jawad was under the custody and physical control of Defendants at all times from the moment he was turned over to U.S. control in Afghanistan on December 17, 2002 until his release from Guantanamo on August 24, 2009. In their numerous attempts to extract intelligence from Jawad, Defendants, acting under actual authority and color of law, employed cruel and inhuman methods of interrogation amounting to torture as defined under the Alien Tort Claims Act. Defendant's actions amounted to a violation of international human rights laws, thus granting this court subject matter jurisdiction.

## SECOND CAUSE OF ACTION

**Plaintiff, a Minor Under the Age of 18 Who Was Not Properly Detained Suffered Inhuman Treatment by Investigative and Law Enforcement Officers of the U.S. Government in Violation of 28 U.S.C. §§ 1346(b), 2671-2680**

89. Plaintiff references and incorporates all previous facts *supra*.

90. The Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, acts as a limited waiver of sovereign immunity of the United States for a number of torts committed by its employees. Where historically private individuals and corporations could not sue the federal government or its employees, the FTCA sets forth procedures for presenting claims against the government and its employees. The statute provides that the United States shall be liable in the same manner and to the same extent as a private individual under like circumstances. The FTCA defines "employee of the government" to include:

> (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and
> (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18. ''Acting within the scope of his office or employment'', in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

91. Section 2680(h) of the FTCA acts as an exception to the United States' waiver of sovereign immunity and bars recovery for any claim arising out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution *unless* these acts are committed by an investigative or law enforcement officer of the United States government. For the purposes of the FTCA, an investigative or law enforcement officer is "any officer of the United States who is empowered by law to execute searches, to seize

evidence, or to make arrests for violations of Federal law." Congress has singled out investigative and law enforcement officers because their positions by nature carry with them the risk of abuse or intentionally tortious conduct.

92. The Foreign Activities Exception of the FTCA, 28 U.S.C. § 2680(k), bars recovery for any claim arising in a foreign country, however, the "headquarters doctrine" permits claims to proceed if the harm occurring in a foreign country was proximately caused by acts in the United States. *Nurse v. United States*, 226 F.3d 996, 1003 (9th Cir. 2000).The headquarters doctrine moves the focus toward the act or omission that occurred and away from the physical location in which it occurred. The quintessential claim under the headquarters doctrine involves federal employees working from offices in the United States guiding and supervising actions in other countries.

93. Consistent with the reasoning in *Boumediene v. Bush*, 553 U.S. 723 (2008), certain rights will prevail over legislative attempts to conceal liability.  A military judge sworn and certified pursuant to the Uniform Code of Military Justice made Commission findings that actions undertaken by personnel aboard U.S. Naval Base Guantanamo Bay should be held accountable and were within the definition of prohibited activities legislated by the U.S. Government.  The U.S. Government cannot prohibit conduct and then turn around and provide no remedy for its violation.  This is exactly what the *Boumediene* court addressed and its rationale applies here.  *Habeas Corpus* is a fundamental check on the wrongful deprivation of liberty.  Here, a minor child, tortured by U.S. Forces, unlawfully detained for over six years, and released without any assistance back onto the streets of Kabul is a similar cause that mandates civil accountability. Jawad was not an alien unlawful enemy combatant.[5] Moreover, this case is unique in that the violations are not simply asserted, they are findings of fact made by the Senior Military Judge in the United States Army at the time of his ruling.  This is a case of first impression.

94. Jawad was restrained and held at FOB, Bagram, and Guantanamo without any justification, consent or probable cause, constituting false arrest and false imprisonment.

---

[5] To date, no CSRT or other competent tribunal has found the Accused to be an alien unlawful enemy combatant (AUEC). This lack of status determination is the subject of a separate defense motion. *See* D-002 - Motion to Dismiss for Lack of Personal Jurisdiction. FN 2 *United States v. Jawad* – D-012 Ruling

He was subjected to inhuman and degrading treatment including but not limited to starvation, sleep deprivation, blindfolding and hooding, beatings, physical and linguistic isolation, shackling, and threats to his life. At each of the three locations, the U.S. forces who orchestrated Jawad's detention and interrogations were "federal officers empowered by law to execute searches, seize evidence, or to make arrests for violations of Federal law" as defined under the FTCA. These acts were performed under the color of law by investigative and law enforcement officers of the U.S. government seeking to extract intelligence from Jawad regarding the attack of December 17, 2002 and not only encompass the enumerated torts of assault, battery, false imprisonment and false arrest, but constitute torture.

95. Although much of the abusive treatment endured by Jawad occurred in Afghanistan, the headquarter doctrine applies as the wrongful acts giving rise to this action were performed by investigative and law enforcement officers acting under the direction, control and command of U.S. officials in Washington, D.C.

96. Defendants, acting under color of law and authority as a United States investigative and law enforcement officers, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or otherwise directly or indirectly participated in the bringing about the false imprisonment, false arrest, torture, and inhuman treatment upon Jawad in violation of 28 U.S.C. §§ 1346(b), 2671-2680.

## THIRD CAUSE OF ACTION

**Plaintiff, A Minor Under the Age of 18 Who Was Not Properly Detained Was Wrongfully Prosecuted Under the Military Commissions Act in Violation of the Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict and in Violation of 28 U.S.C. §§ 1346(b), 2671-2680**

97. Plaintiff references and incorporates all previous facts *supra*.

98. The U.S. Senate ratified the Protocol on December 23, 2002.  The Protocol obligates the United States, *inter alia*, to undertake the following actions with respect to "persons within their jurisdiction recruited or used in hostilities contrary to the . . . Protocol":

> (1) Take all feasible measures to ensure that they are demobilized or otherwise released from service;

(2) When necessary, accord all appropriate assistance for their physical recovery;
(3) When necessary, accord all appropriate assistance for their psychological recovery; and
(4) When necessary, accord all appropriate assistance for their social reintegration.

99. The United States, by ratifying the Protocol, obligated itself to recall the "obligations of each party to an armed conflict to abide by the provisions of international humanitarian law." This would include the U.S. statutory prohibitions on torture and inhumane treatment discussed *supra*.

## FOURTH CAUSE OF ACTION

**Defendants actions have given rise to a *Bivens*[6] cause of action**

100.     Plaintiff references and incorporates all previous facts *supra*.

101.     Plaintiff was deprived of his constitutional rights by federal agents who were acting under the color of authority.

## FIFTH CAUSE OF ACTION

102.     Plaintiff references and incorporates all previous facts *supra*.

103.     Defendant's actions violate the Fourteenth Amendment of the U.S. Constitution.

## RELIEF

104.     Plaintiff respectfully requests that this Court grant the following relief:

a.   Compensatory damages including damages for pain and suffering, in an amount to be determined at trial;

b.   Punitive and exemplary damages in an amount to be determined at trial;

c.   Reasonable attorneys' fees and costs of suit; and

d.   Such other relief as this Court deems just and proper.

---

[6] *Bivens v. SixUnknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971)).

## DEMAND FOR JURY TRIAL

Respectfully submitted,

s/ Eric Montalvo

ERIC S. MONTALVO
Founding Partner
**THE FEDERAL PRACTICE GROUP**
1150 Connecticut Ave, NW
Washington, D.C. 20036
(202) 862-4360
emontalvo@fedpractice.com

Counsel for Plaintiff

Date: May 12, 2014

### Certificate of Service

I hereby certify that on this 12th day of May, 2014, I caused to be served by electronic filing a copy of "Complaint for Damages". I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

s/ Eric Montalvo

ERIC S. MONTALVO
Founding Partner
THE FEDERAL PRACTICE GROUP
1150 Connecticut Ave, NW
Washington, D.C. 20036
(202) 862-4360
emontalvo@fedpractice.com

Counsel for Plaintiff