# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MOHAMMED JAWAD,**<br>*also known as* **SAKI BACHA,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**ROBERT M. GATES, et al.,**<br><br>        **Defendants.** | **Civil Action No. 14-811 (ESH)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Mohammed Jawad has sued the United States and a host of government officials under the Alien Tort Claims Act ("ATCA" or "ATS"), 28 U.S.C. § 1350; the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680; the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350; and the Fifth and Eighth Amendments to the United States Constitution. Jawad was a detainee at Forward Operating Base 195 in Afghanistan and subsequently at the United States Naval Base in Guantanamo Bay, Cuba from 2002 until he was released in 2009. The United States has now moved to dismiss plaintiff's ATCA and FTCA claims. The individual plaintiffs have moved to dismiss the TVPA and constitutional claims. Because D.C. Circuit precedent has already addressed plaintiff's claims and rejected them, this Court will grant defendants' motions to dismiss.

## BACKGROUND

Plaintiff alleges the following in his amended complaint. Although he does not know his exact age, plaintiff, an Afghan citizen, believes he was born in 1987. (Am. Compl. for Damages [ECF No. 10] ("Compl.") ¶¶ 1, 28.) On December 17, 2002, Afghan forces captured plaintiff after a hand grenade attack badly injured several U.S. soldiers and their Afghan interpreter in a

Kabul bazaar.  (*Id.* ¶ 31.)  Plaintiff's Afghan captors abused and threatened him, eventually

forcing him to sign a confession (written in a language that he could not read) with his

thumbprint.  (*Id.* ¶¶ 33-34.)  Plaintiff was subsequently transferred into the custody of U.S.

forces at Forward Operating Base ("FOB") 195 outside Kabul.  (*Id.* ¶¶ 39-40.)  U.S. officials

continued to interrogate plaintiff and "deprive[d] him of food, drink, and sleep."  (*Id.* ¶ 41.)

Plaintiff was "strip-searched, and then photographed in the nude in front of several on-lookers."

(*Id.* ¶ 43.)  "He was blindfolded and hooded, told that if he did not cooperate that he would never

see his family again, and made to hold a water bottle which he was told was a bomb that could

explode at any moment."  (*Id.*)  Several hours later, "he admitted responsibility for the attack."

(*Id.* ¶ 44.)

On December 18, 2002, plaintiff was transferred from FOB 195 to "the U.S. detention

facility [in] Bagram, Afghanistan."  (*Id.* ¶ 48.)  At that installation, plaintiff was "subjected to

cruel, abusive, and inhumane treatment," including "maltreatment, torture in the form of

beatings, hooding, physical and linguistic isolation, sleep deprivation, death threats, forced stress

positions, being chained to the wall for prolonged periods, pushed down the stairs, and various

other forms of intimidation."  (*Id.* ¶ 50.)

On February 6, 2003, plaintiff was transferred to Guantanamo Bay Naval Base.  (*Id.* ¶

52.)  Prior to his transfer, plaintiff was "intentionally starved for three days and given only sips

of water," because detainees "were not permitted to use the toilet while in transit."  (*Id.* ¶ 52 &

n.8.)  Plaintiff "spent the majority of 2003 in social, physical, and linguistic isolation, with his

only human contact being his interrogators."  (*Id.* ¶ 56.)  He was "housed with the adult

population, rather than in separate facilities for juveniles."  (*Id.*)  On December 25, 2003, he

attempted suicide.  (*Id.* ¶ 57.)  "By March 2004, Plaintiff was deemed to be of no intelligence

value to the U.S.," but "he was still subjected to over 60 interrogations," which included "excessive cold, loud noise, beatings, pepper-spray, and being shackled for prolonged periods." (*Id.* ¶¶ 58-60.)

Plaintiff complains in particular about "a sleep deprivation regimen" euphemistically termed the "'frequent flyer' program," which "consisted of repeatedly moving a detainee from one cell to another in quick intervals throughout the night to disrupt sleep cycles, on average every three hours." (*Id.* ¶¶ 61-62.)  "The standard length for the frequent flyer program was two weeks." (*Id.* ¶ 62.)  The program was used both as an "interrogation technique" and as "a form of punishment . . . for detainees." (*Id.* ¶¶ 63-64.)  "Defendant Jay Hood assumed command of [the Joint Task Force] – Guantanamo in March 2004, and ordered the use of the frequent flyer program discontinued as an interrogation technique," but it continued to be used as "a method of controlling detainees," and "Plaintiff was subjected to the frequent flyer program from May 7 – 20, 2004." (*Id.* ¶¶ 67-68.)

Plaintiff appeared before a Combatant Status Review Tribunal ("CSRT") in November 2004.  (*Id.* ¶ 79.)  The CSRT determined that plaintiff was an enemy combatant, and that status determination was reaffirmed at Administrative Review Board proceedings on December 8, 2005 and November 8, 2006.  (*Id.* ¶¶ 80-81.)  On October 9, 2007, "Plaintiff was charged under the Military Commissions Act of 2006 with three [counts] each of 'attempted murder in violation of the law of war' and 'intentionally causing serious bodily injury.'" (*Id.* ¶ 84.)  "[P]rosecutors in the military commission expressed their intention to offer [plaintiff's] statement/confession . . . into evidence . . . Plaintiff's defense counsel filed a motion to suppress the statement as the product of torture." (*Id.* ¶ 85.)  The motion was granted.  (*Id.*)  On appeal, the U.S. Court of Military Commission Review deemed the statement inadmissible "because the confessions had

been acquired through the use of death threats." (*Id.* ¶ 87.)  The Commission also found that "[t]he infliction of the 'frequent flyer' technique upon the Accused . . . had no legitimate interrogation purpose' and that plaintiff had been "beaten, kicked, and pepper sprayed for not complying with a guard's instruction" on or about June 2, 2008.  (*Id.* ¶ 88.)  The Commission concluded that subjecting plaintiff to the frequent flyer program constituted "abusive conduct and cruel and inhuman treatment." (*Id.*)

In 2005, a writ of habeas corpus was filed on plaintiff's behalf.  (*Id.* ¶ 89.)  On July 24, 2009, "the Justice Department filed a notice informing the court that it was dropping its opposition to the habeas petition and no longer considered Plaintiff legally detainable." (*Id.* ¶ 92.)  This Court granted plaintiff's habeas petition on July 30, 2009, "and Plaintiff was repatriated." (*Id.* ¶ 93.)

Plaintiff has now filed suit against the United States and individual federal defendants.  In his first cause of action, plaintiff alleges that "Defendants tortured and inhumanely treated Plaintiff in violation of the law of . . . nations," which "constitute[d] a violation of international law under the [ATCA] and the [FTCA]." (*Id.* ¶ 95.)  Plaintiff alleges that defendants "held Plaintiff in solitary confinement; deprived Plaintiff of food and drink; subjected Plaintiff to sleep deprivation; threatened Plaintiff; beat, kicked, and pepper-sprayed Plaintiff; exposed Plaintiff to extreme temperatures; sexually humiliated Plaintiff; [and] deprived Plaintiff of adequate medical care." (*Id.* ¶ 98.)  Plaintiff also alleges that the "'frequent flyer' program . . . constituted abusive conduct and cruel and inhumane treatment." (*Id.* ¶ 99.)  Plaintiff contends that "Defendants tortured Plaintiff under color of official authority," and argues that this torture "violated the laws of nations, as defined by customary international law, multilateral treaties, and other international instruments." (*Id.* ¶¶ 96, 105.)

4

In the second cause of action, plaintiff claims that defendants' actions constituted "a violation of international law under the [ATCA] and the [FTCA], in that Defendants tortured and inhumanely treated Plaintiff in violation of the Third and Fourth Geneva Conventions." (*Id.* ¶ 107.) He contends that the actions described above "violate the Geneva Convention's prohibition on disciplinary punishment that are inhumane, brutal, or dangerous to the health of prisoners of war." (*Id.* ¶ 116.)

In the third cause of action, plaintiff contends that his treatment violated Article 6 and Article 7 of the Optional Protocol on the Involvement of Child Soldiers in Armed Conflict, which he again argues constituted a violation of international law under the ATCA and the FTCA. (*Id.* ¶ 119.) He argues that defendants' failure to "assist in Plaintiff's physical recovery, psychological recovery, or prepare Plaintiff for social reintegration," violated the Protocol "through his release." (*Id.* ¶ 122.)

The fourth cause of action alleges unlawful torture in violation of the TVPA, also in violation of international law under the ATCA and the FTCA. (*Id.* ¶ 125.)

In the fifth and sixth causes of action, plaintiff alleges that defendants are liable for violating his Fifth and Eighth Amendment rights. (*Id.* ¶¶ 136-137, 146-147 (citing *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).) He claims that "Defendants violated the Fifth Amendment by ordering the indefinite and arbitrary detention of Plaintiff without adequate due process of law" and that the torture he suffered constituted "cruel and unusual punishment." (*Id.* ¶¶ 144, 146.) He contends that "Defendants had actual and constructive knowledge that they and their subordinates were violating Plaintiff's constitutional rights, and that these violations were occurring as a result of Defendant[s'] orders, instructions, and omissions." (*Id.* ¶ 140.)

# ANALYSIS

## I.     SUBSTITUTION

Plaintiff brings his six causes of actions against all of the defendants, including the four individuals in their personal capacity.[1]   In its motion to dismiss, the United States argues that "[t]he law is clear . . . that plaintiff may pursue his first three counts, if at all, only against the United States under the FTCA."  (Statement of P. & A. in Supp. of Mot. of the United States of America to Dismiss Pl.'s Am. Compl. [ECF No. 28-1] ("U.S. Mot.") at 11.)  The United States argues that substitution of itself for the individual defendants is proper because the individual defendants were federal employees acting within the scope of their employment.  (*Id.*)

The FTCA authorizes federal district courts to hear "civil actions on claims against the United States, for money damages" arising out of injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," if a private person in like circumstances would face liability under state law.  28 U.S.C. § 1346(b)(1).  However, "[t]he Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, 'accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties.'"  *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir. 2009) (quoting *Osborn v. Haley*, 549 U.S. 225, 229 (2007)); *see also* 28 U.S.C. § 2679(b)(1).  The Attorney General may certify "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose."  28. § U.S.C. 2679(d)(1).  Upon certification, the claim "shall be deemed an action against the United States . . . and the

---

[1] These individuals are retired Major General Geoffrey D. Miller, retired Major General Jay W. Hood, retired Major General Nelson J. Cannon, and Esteban Rodriguez.  (*See* Compl. ¶¶ 21-24.)

United States shall be substituted as the party defendant." *Id.* "A plaintiff may contest the Attorney General's scope-of-employment certification before a district court." *Wuterich*, 562 F.3d at 381. If he does so, the certification "constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment," which the plaintiff may attempt to rebut by alleging "sufficient facts that, taken as true, would establish that the defendant['s] actions exceeded the scope of [his] employment." *Id.* (internal quotation marks omitted) (alterations in original). Westfall Act immunity also includes exceptions for claims alleging either "a violation of the Constitution" or "a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2).

### A. Scope of Employment

The Attorney General, through his designee, has certified that the individual defendants were acting within the scope of their federal employment. (Certification of Scope of Employment [ECF No. 27-1].) Plaintiff attempts to rebut this certification by arguing that torture falls outside the individual defendants' scope of employment. In particular, plaintiff argues that "Defendants acted as rogue officials who implemented a policy of torture that had been previously prohibited and . . . undertook such torture for no intelligence gathering purpose." (Mem. of P. & A. in Supp. of Pl.'s Opp. to Def. United States of America's Mot. to Dismiss Pl.'s Am. Compl. [ECF No. 31] ("Pl.'s Opp. to U.S. Mot.") at 4.) Plaintiff cites to an opinion by the U.S. Court of Military Commission Review, which found that plaintiff was subjected to the frequent flyer program after "Major General . . . Jay Hood ordered [the program] discontinued." (*Id.*, Ex. A [ECF No. 31-1] ("Commission Decision") ¶ 5.) The same opinion also noted that the frequent flyer program continued despite having "no legitimate interrogation purpose" and that the program's "continuation was not simple negligence but flagrant misbehavior." (*Id.* ¶¶ 6, 12.)

Plaintiff also alleges that defendants acted outside the scope of their employment by subjecting

him to fourteen days of the frequent flyer program, which exceeded the four-day sleep-

deprivation maximum approved by Secretary of Defense Donald Rumsfeld.  (Pl.'s Opp. to U.S.

Mot. at 5; *see also* Compl. ¶ 65.)  Finally, plaintiff argues that the torture engaged in by

defendants was "not actuated by a purpose to serve the United States," since it was "not for any

interrogative purpose", and thus falls outside their scope of employment under D.C. agency law.

(Pl.'s Opp. to U.S. Mot. at 6.)

The majority of plaintiff's arguments were considered and flatly rejected by the D.C.

Circuit in *Allaithi v. Rumsfeld*, 753 F.3d 1327 (D.C. Cir. 2014).  In *Allaithi*, several detainees

were subjected to abuse – including "forced grooming, solitary confinement, sleep deprivation,

forced medication, transport in 'shackles and chains, blackened goggles, and ear coverings,' and

the disruption of . . . religious practices" – even after a CSRT had determined that there were not

enemy combatants.  *Id.* at 1329.  Following D.C. law, the *Allaithi* Court looked to the Second

Restatement of Agency[2] to determine if the individual defendants were acting within the scope

of their employment.  *Id.* at 1330.  The Court held that the defendants' actions were "'of the

kind' [they were] employed to perform," even though the mistreatment occurred when several of

the plaintiffs "had no intelligence value."  *Id.* at 1332.  The Court noted that "[t]hough the

intelligence rationale has dissipated, the need to maintain an orderly detention environment

remained after CSRT clearance."  *Id.*  The Court continued: "Authorized or not, the conduct was

---

[2] The Restatements sets forth four factors, "all of which must apply for the conduct of a servant
to fall within the scope of employment: (a) it is of the kind he is employed to perform; (b) it
occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part,
by a purpose to serve the master; and (d) if force is intentionally used by the servant against
another, the use of force is not unexpectable by the master."  *Allaithi*, 753 F.3d at 1330 (quoting
Restatement (Second) of Agency § 228(1) (1958)).

certainly foreseeable because maintaining peace, security, and safety at a place like Guantanamo

Bay is a stern and difficult business." *Id.* at 1333.  The *Allaithi* Court also rejected the plaintiffs'

argument that the defendants' actions were not in service of their master, finding that defendants

were serving the government's "well-recognized penological interest in 'maintaining security

and discipline' at Guantanamo Bay." *Id.*  "[T]o fall outside the scope of employment," the

"employee [must] be *solely* motivated by his own purposes," and as the Court found, it is

implausible that "defendants' post-clearance conduct was *entirely* motivated by some sort of

personal animus." *Id.*

    *Allaithi* forecloses plaintiff's argument that defendants' conduct was outside the scope of

employment simply because it did not serve an intelligence-gathering purpose.  Plaintiff has

failed to demonstrate that the frequent flyer program and the other mistreatment he suffered was

not in furtherance of the government's "well-recognized penological interest in 'maintaining

security and discipline' at Guantanamo Bay." *Id.*  Indeed, plaintiff concedes in his complaint

that "the frequent flyer program was also used . . . as a form of punishment or 'disincentive' for

detainees, distinct from the interrogation process." (Compl. ¶ 64.)  As such, plaintiff has failed

to show that defendants' conduct was not "actuated, at least in part, by a purpose to serve the

master." *Allaithi*, 753 F.3d at 1330 (quoting Restatement (Second) of Agency § 228(1) (1958)).

    Plaintiff's only other argument is that "Defendants acted as rogue officials who

implemented a policy of torture that had been previously prohibited." (Pl.'s Opp. to U.S. Mot. at

4.)  Plaintiff's allegations, however, do not support this contention.  Plaintiff alleges only that

"Defendant Jay Hood . . . ordered the use of the frequent flyer program discontinued *as an*

*interrogation technique*." (Compl. ¶ 67 (emphasis added); *see also id.* ¶ 68 ("[Defendant Jay

Hood] apparently did not order [the frequent flyer program] discontinued . . . as a method of

controlling detainees.").)  As noted above, plaintiff concedes that the frequent flyer program was *also* used for disciplinary purposes.  (*See id.* ¶ 64.)  This concession undermines plaintiff's argument that the frequent flyer program was conducted in contravention of orders by rogue officials.[3]  Moreover, even if the frequent flyer program was conducted in an unauthorized manner, plaintiff has failed to allege how the *named* defendants were acting outside the scope of their employment.  (*See id.* ¶¶ 21-24 (discussing supervisory responsibilities of the named plaintiff); *Allaithi*, 753 F.3d at 1333 ("Despite vividly detailing the various abuses allegedly endured by the Appellants, the complaints do not specify how the *named defendants* were involved with these abuses.").)  As such, this Court must conclude that defendants' conduct, as alleged by plaintiff, fell within the scope of their federal employment.[4]

---

[3] Plaintiff also argues that defendants' actions were unauthorized because Secretary of Defense Rumsfeld set a four-day limit on detainee sleep deprivation.  (*See* Compl. ¶ 65.)  Plaintiff does not allege, however, that this limit applied to the frequent flyer program.  (*See id.* (explaining that Guantanamo officials considered the frequent flyer program "sleep adjustment" rather than "sleep deprivation").)  Moreover, exceeding the four-day limit is insufficient to demonstrate that the conduct was "*entirely* motivated by some sort of personal animus."  *Allaithi*, 753 F.3d at 1333; *see also id.* ("Authorized or not, the conduct was certainly foreseeable because maintaining peace, security, and safety at a place like Guantanamo Bay is a stern and difficult business. We are therefore hard-pressed  to conclude the actions leading to the plaintiffs' treatment were not 'a direct outgrowth of the [defendants'] instructions or job assignment.'" (alteration in original) (quoting *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979)); Restatement (Second) of Agency § 230 ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment.").

[4] Plaintiff also cites various prohibitions against torture, contending that "[i]t is inherently incredible that Defendants' conduct in committing acts in violation of the War Crimes Act is of the kind they are 'employed to perform.'"  (Pl.'s Opp. to U.S. Mot. at 12 (quoting 18 U.S.C. § 2441.)  Courts in this Circuit, however, have consistently found that conduct similar to that alleged by plaintiff fell within the scope of defendants' employment.  *E.g.*, *Allaithi*, 753 F.3d at 1332; *Ali v. Rumsfeld*, 649 F.3d 762, 765-66, 774-75 (D.C. Cir. 2011) (mistreatment of detainees in military facilities in Iraq and Afghanistan, including beatings, hoodings, sexual assault, humiliation, deprivation of food and water, use of racial epithets, extended solitary confinement, and prolonged sleep deprivation, was within defendants' scope of employment); *Rasul v. Myers*, 512 F.3d 644, 660 (D.C. Cir. 2008) ("[H]ere it *was* foreseeable that conduct that would ordinarily be indisputably 'seriously criminal' would be implemented by military officials responsible for detaining and interrogating suspected enemy combatants."), *vacated*, 555 U.S.

**B.  Violation of the Constitution or Federal Statute**

Plaintiff argues that "[t]he Westfall Act does not apply in this case . . . [because] Plaintiff has asserted both statutory and constitutional violations."  (Pl.'s Opp. to U.S. Mot. at 3.)  In particular, plaintiff first contends that "[t]he Supremacy Clause places ratified treaties on the same footing as federal statutes."  (*Id.* at 15.)  This arguments lacks merit.  "[E]very court to consider the issue has determined that the Westfall Act's exemption for statutory claims does not include claims brought pursuant to a treaty."  *Sobitan v. Glud*, 589 F.3d 379, 386 (7th Cir. 2009); *see also Ali*, 649 F.3d at 776 ("[W]e hold that the plaintiffs' claim under the ATS alleges a violation of the law of nations, not of the ATS, and therefore does not violate a statute of the United States within the meaning of [the Westfall Act].");  *Harbury v. Hayden*, 444 F. Supp. 2d 19, 37 (D.D.C. 2006) ("International law, however characterized (i.e., the law of nations, federal common law), falls outside of these clearly enumerated exceptions [to the Westfall Act]."), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008).

Plaintiff next argues that "Defendants' violation of international law and treaties violated a myriad of domestic statutes prohibiting torture."  (Pl.'s Opp. to U.S. Mot. at 16.)  This argument also fails.  The first three causes of action of plaintiff's complaint do not allege a violation of any federal statute other than the FTCA and the ATCA.  (*See* Compl. ¶¶ 94-123.) And while plaintiff cites a number of statutes prohibiting torture, none of these statutes creates a private cause of action.  *See* 18 U.S.C. § 2441 (criminalizing various war crimes); 10 U.S.C. § 893 (authorizing court-martial punishment for cruelty and maltreatment); 18 U.S.C. § 2340A

---

1083 (2008), *reinstated in relevant part on remand*, 563 F.3d 527 (D.C. Cir. 2009) (per curiam); *Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 114 (D.D.C. 2010) ("[Defendants'] conduct was therefore foreseeable and incidental to the defendants' positions as military, medical, or civilian personnel in connection with Guantanamo and accordingly falls within the scope of their employment.").

(criminalizing torture); 42 U.S.C. § 2000dd-0 (prohibiting detainee mistreatment); *see also Doe v. Rumsfeld*, 683 F.3d 390, 397 (D.C. Cir. 2012) (finding that 42 U.S.C. § 2000dd, which contains nearly identical language to 42 U.S.C. § 2000dd-0, does not include a private right of action); *Garey v. Thompson*, No. 5:07-cv-322, 2010 U.S. Dist. LEXIS 53378, at *4 (M.D. Ga. June 1, 2010) ("[T]he Court finds that 42 U.S.C. §§ 2000d and 2000dd-0 do not create a private cause of action.").  Since plaintiff's first three counts fail to allege a constitutional violation or a "violation of a statute of the United States under which such action against an individual is otherwise authorized," 28 U.S.C. § 2679(b)(2), this Court must substitute the United States for the individual defendants named in Count I-III.

## II.    SOVEREIGN IMMUNITY

The United States contends that plaintiff's first three causes of action – which are all brought pursuant to the FTCA – must be dismissed for lack of subject matter jurisdiction on the grounds that the United States has not waived its sovereign immunity.  The United States observes that "[t]he FTCA does not permit suit against the United States for '[a]ny claim arising in a foreign country,'" and argues that all of plaintiff's alleged injuries were "sustained in Afghanistan and Cuba," which are foreign countries for purposes of the FTCA.  (*Id.* at 24-25 (quoting 28 U.S.C. § 2680(k).)  Plaintiff concedes that "this Court has held Guantanamo Bay is a foreign country under the FTCA" but "respectfully requests the Court reconsider this decision in light of the facts of this case and the evolution of human rights law."  (Pl.'s Opp. at U.S. Mot. at 40-41.)  Plaintiff contends that "the United States exercises complete jurisdiction and control over Guantanamo Bay" and points out that "only U.S. law applies" there.  (*Id.* at 42.)

This Court must decline plaintiff's request.  "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court

define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted).   "The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S 807, 813 (1976).  As both parties acknowledge, however, the FTCA explicitly excludes from its waiver of sovereign immunity "[a]ny claim arising in a foreign country."  28 U.S.C. § 2680(k); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004) ("[T]he FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred.").  Courts in this Circuit have consistently held that the foreign country exception encompasses claims arising from injuries sustained on U.S. installations in Afghanistan and Guantanamo. *E.g.*, *Al Janko v. Gates*, 831 F. Supp. 2d 272, 284 (D.D.C. 2011) ("Guantánamo fits well within the Supreme Court's 'foreign country' definition for purposes of the FTCA . . . ."); *Al-Zahrani*, 684 F. Supp. 2d at 116-19 (rejecting plaintiffs' argument that "Guantanamo is not a 'foreign country' under the FTCA because only U.S. law applies there"); *accord Ameur v. Gates*, 950 F. Supp. 2d 905, 919 & n.5 (E.D. Va. 2013).  Since the Court finds the rationale set forth in these opinions to be persuasive, Counts I, II, and III will be dismissed for lack of subject matter jurisdiction.

## III.      TORTURE VICTIM PROTECTION ACT

Defendants argue that plaintiff's fourth cause of action "must be dismissed for failure to state a claim under the TVPA."  (Statement of P. & A. in Supp. of Mot. of the Individual Federal Defs. to Dismiss Pl.'s Am. Compl. [ECF No. 29-1] ("Individual Defs.' Mot.") at 21.)  The TVPA provides that an "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to

that individual."  28 U.S.C. § 1350 Note, § 2(a).  Defendants contend that "plaintiff's amended

complaint contests actions taken by United States government personnel pursuant to the

authority, law, and policies of the United States" and that plaintiff "does not even remotely

suggest that he brings any grievance against any individual doing anything 'under actual or

apparent authority, or color of law, of any foreign nation.'"  (Individual Defs.' Mot. at 24

(quoting 28 U.S.C. § 1350 Note, § 2(a)).)  Plaintiff appears to concede this point, but argues that

the "[t]he portion of the TVPA exempting United States Officials from liability violates not only

binding and well-established customary international law, but also United States' domestic laws

prohibiting torture."  (Mem. of P. & A. in Opp. of the Individual Defs.' Mot. to Dismiss Pl.'s

Am. Compl. [ECF No. 32] ("Pl.'s Opp. to Individual Defs.' Mot.") at 27.)  Plaintiff therefore

urges this Court to "find the provision of the TVPA limiting liability to those acting under the

law of a 'foreign nation' . . . unconstitutional and provide Plaintiff a remedy consistent with the

purpose of the law."  (*Id.* at 28.)

   "It is the peculiar province of the legislature to prescribe general rules for the government

of society . . . ."  *Fletcher v. Peck*, 6 Cranch 87, 136 (1810).  As even plaintiff must

acknowledge, Congress limited liability under the TVPA to individuals acting pursuant to the

authority of a foreign nation.  Although plaintiff styles his argument as an objection to the

constitutionality of the TVPA, he is in effect requesting that this Court rewrite that law to imply

a new cause of action against U.S. officials.  As will be explained *infra*, Circuit precedent

forecloses this Court from creating a *Bivens* remedy for plaintiff.  It would similarly be

inappropriate to expand the TVPA beyond the limits clearly established by Congress.  *See Al

Bahlul v. United States*, 767 F.3d 1, 17 (D.C. Cir. 2014) ("[A] court cannot 'rewrite a law to

conform it to constitutional requirements, for doing so would constitute a serious invasion of the

14

legislative domain.'" (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)).  Since

plaintiff's complaint fails to allege any wrongdoing by an individual acting pursuant to the

authority of a foreign nation, his fourth cause of action will be dismissed.

## IV.    IMPLIED *BIVENS* REMEDY

Defendants next urge this Court to dismiss plaintiff's fifth and sixth causes of actions

against the individual defendants, which allege violations of the Fifth and Eighth Amendments

and request a *Bivens* remedy.  Defendants argue that "[t]he D.C. Circuit has already rejected

proposed *Bivens* claims on special factors grounds in legally indistinguishable cases brought by

post-9/11 alien detainees against United States government officials."  (Individual Defs.' Mot. at

11.)  Contrary to clearly established law, plaintiff responds that allowing him to "pursue his

*Bivens* claims would not disrupt or hinder the ability of our military to act decisively in defense

of our national interests."  (Pl.'s Opp. to Individual Defs.' Mot. at 10.)

Plaintiff's arguments are squarely foreclosed by Circuit precedent.  As this Court

explained previously, "[t]he D.C. Circuit's conclusion that special factors counsel against the

judiciary's involvement in the treatment of detainees held at Guantanamo binds this Court and

forecloses it from creating a *Bivens* remedy for plaintiffs here."  *Al-Zahrani*, 684 F. Supp. 2d at

112.  The rationale articulated in *Al-Zahrani* applies with equal force to plaintiff's complaint.

*See id.* at 111-12.  Since *Al-Zahrani*, the Circuit has reaffirmed its refusal to create a *Bivens*

remedy in at least two cases that are indistinguishable from this one.  *See Allaithi*, 753 F.3d at

1334 ("[S]pecial factors counsel against allowing the [*Bivens*] claim to move forward."); *Ali*, 649

F.3d at 774 ("[E]ven if the defendants were not shielded by qualified immunity and the plaintiffs

could claim the protections of the Fifth and Eighth Amendments, we would decline to sanction a

*Bivens* cause of action because special factors counsel against doing so.").  Plaintiff fails to

address this binding Circuit law, instead repeating arguments that have previously been rejected. This Court has no choice but to dismiss plaintiff's fifth and sixth causes of action.

## V.    MILITARY COMMISSIONS ACT

Defendants argue, in the alternative, that the Military Commissions Act ("MCA") bars all of plaintiff's claims against both the United States and the named defendants.  (*See* U.S. Mot. at 20-23; Individual Defs.' Mot. at 10-11.)  Plaintiff responds that the MCA's jurisdiction-stripping provision is inapplicable to him and, in any case, is unconstitutional.  (*See* Pl.'s Opp. to U.S. Mot. at 19-34.)

The MCA provides:

[N]o court, justice, or judge shall have jurisdiction to hear or consider any [non-habeas] action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(2).  Plaintiff does not dispute that this is a non-habeas action "against the United States or its agents relating to [an] aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States."  *Id.*  Instead, plaintiff asserts that "neither a CSRT nor ARB determined Plaintiff was an 'enemy combatant.'" (Pl.'s Opp. to U.S. Mot. at 21.)  For support, plaintiff cites the opinion by the U.S. Court of Military Commission Review, which found that "no CSRT or other tribunal has found the Accused to be an alien unlawful enemy combatant."  (Commission Decision ¶ 2.)  Section 2241(e)(2) does not, however, require a finding that plaintiff was an "*unlawful* enemy combatant," merely that he was an "enemy combatant."  In his complaint, plaintiff concedes that after "appear[ing] before a CSRT," he "was determined to be an enemy combatant" and that his "enemy combatant status was reaffirmed in ARBs conducted on December 8, 2005, and

November 8, 2006." (Compl. ¶¶ 79-81.) These concessions negate any argument that plaintiff was never found to be an enemy combatant.

Plaintiff next argues that § 2241(e)(2) does not apply to him because, during his habeas proceedings, "the Executive Branch . . . confirmed Plaintiff was no longer considered detainable under the AUMF." (Pl.'s Opp. to U.S. Mot. at 22.) Plaintiff contends that "[i]t defies logic to bar jurisdiction on the basis of a prior made decision . . . that Plaintiff is an enemy combatant when the United States has more recently confirmed that he is not." (*Id.*) Plaintiff's argument is deficient on several fronts. First, nothing in the record indicates that the United States determined that plaintiff was, in fact, *not* an enemy combatant. Rather, the relevant filing merely stated that the government would "no longer treat [plaintiff] as detainable under the Authorization for Use of Military Force." (Pl.'s Opp. to U.S. Mot., Ex. D at 1.) Plaintiff fails to explain how this statement constitutes a rescission of the government's earlier classification of him as an enemy combatant. (*See* Reply in Supp. of Mot. to Dismiss of the United States of America [ECF No. 34] at 16 n.5 (explaining multiple possible reasons for the government's litigation decision).)

Even if the court filing cited by plaintiff did constitute an admission by the Executive Branch that the previous CSRT classification was erroneous, D.C. Circuit precedent dictates that the § 2241(e)(2) would still apply. In *Al Janko v. Gates*, 741 F.3d 136 (D.C. Cir. 2014), the Circuit considered a lawsuit filed by an individual who had been twice classified by CSRTs as an enemy combatant but was subsequently released when a district court granted his habeas petition for lack of evidence that he was lawfully detainable as an enemy combatant. *Id.* at 138 (citing *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 130 (D.D.C. 2009)). The Circuit held that the MCA's jurisdiction-stripping provision "requires only that the Executive Branch determine that the

AUMF authorizes the alien's detention without regard to the determination's correctness."  *Id.* at

144.  The holding of *Al Janko* is dispositive.  Plaintiff has conceded that the Executive Branch,

through a CSRT, classified him as an enemy combatant.  The MCA jurisdictional bar therefore

applies, regardless of any subsequent admissions of error by the government.[5]

Plaintiff next contends that "[g]iven [his] age, pursuant to the Child Soldier Protocol, the

United States should never have taken custody of Plaintiff" and that, "[h]ad the United States not

violated this treaty, Plaintiff would never have been transferred to Guantanamo Bay and a CSRT

proceeding would never have taken place."  (Pl.'s Opp. to U.S. Mot. at 26.)  Even if plaintiff is

correct, however, he has not explained why his juvenile status should negate the effect of 28

U.S.C. § 2241(e)(2).  *See Khadr v. Bush*, 587 F. Supp. 2d 225, 234-37 (D.D.C. 2008) (holding

that the § 2241(e)(2) jurisdictional bar applied to a plaintiff's request for a base transfer pursuant

to the Child Soldier Protocol).

As a final matter, plaintiff challenges 28 U.S.C. § 2241(e)(2) as unconstitutional, both

facially and as applied to him.  (Pl.'s Opp. to U.S. Mot. at 26-34.)  He contends that the

"elimination of jurisdiction over federal question claims must be struck down as unconstitutional

as prohibited by Article III," that the CSRTs lacked important due process protections, and that

the statute is "invalid given it is a Bill of Attainder in violation of Article I."  (*Id.* at 26-31.)

These arguments lack merit.  The Circuit has foreclosed plaintiff's first argument by holding that

the government is not constitutionally required to provide injured plaintiffs with a money

damages remedy.  *Al Zahrani v. Rodriguez*, 669 F.3d 315, 319-20 (D.C. Cir. 2012).  With respect

---

[5] The Circuit's holding in *Al Janko* similarly disposes of plaintiff's argument that he "did not
meet the AUMF requirements for enemy combatant."  (Pl.'s Opp. to U.S. Mot. at 24.)
"Conditioning the statute's applicability on the accuracy of the Executive Branch's
determination would do violence to the statute's clear textual directive."  *Al Janko*, 741 F.3d at
144.

to plaintiff's second argument, the D.C. Circuit has repeatedly upheld the validity of CSRTs as a means of making enemy combatant determinations.  *Al Janko*, 741 F.3d at 145-47; *Al-Zahrani*, 669 F.3d at 319-20; *see also Al-Zahrani*, 684 F. Supp. 2d at 109 ("The argument that because CSRT review has been found to be an inadequate substitute for habeas review, it is also inconclusive for 'purposes of application of MCA Section 7' is baseless.").  And finally, the Court agrees with the Ninth Circuit's conclusion that "§ 2241(e)(2) is not a bill of attainder because it does not inflict legislative punishment."  *Hamad v. Gates*, 732 F.3d 990, 1004 (9th Cir. 2013); *accord Ameur v. Gates*, 759 F.3d 317, 329 (4th Cir. 2014) ("Lastly, § 2241(e)(2) is not a bill of attainder.").  As such, this Court concludes that all of plaintiff's claims are statutorily barred by 28 U.S.C. § 2241(e)(2).[6]

## CONCLUSION

While this Court shares plaintiff's condemnation of the treatment and the conditions that he was subjected to in Guantanamo and agrees that such conduct is contrary "to fundamental American values of justice" (Pl.'s Opp. to U.S. Mot. at 2), it is simply not correct to argue that it is within this Court's power to create a remedy for what happened there.  Both Congress and the D.C. Circuit, in a line of cases involving claims that mirror those of Mohammed Jawad, have squarely addressed plaintiff's claims and have made it clear that this Court, which is bound by the laws of Congress and D.C. Circuit precedent, must dismiss plaintiff's complaint with prejudice.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

---

[6] In light of the above holdings, this Court need not address defendants' arguments that plaintiff's claims are barred by qualified immunity and the statute of limitations.

Date:   July 8, 2015